Good morning, Your Honors, and may it please the Court, Sonia Rolston for the United States. You're asked to reserve five minutes for the rebuttal. This case asks whether Section 2423, as applied to Mr. Park, is constitutional in any of four ways. That's under the Commerce Power or the Treaty Power, outlined in a matrix, the F-3 Conduct of Production and the F-1 Conduct of Child Sexual Abuse, F-1, 2, 3, 4, as outlined in the briefs. And because this Court is exercising no rule review, Mr. Park continues to bear the heavy burden of making a, quote, plain showing that Congress has exceeded its constitutional bounds. He has not and cannot do so. This Court should therefore reverse and reinstate the indictment. Turning first to that first box, the F-3 Production Conduct under the Commerce Clause. This is the easiest way to resolve this part of the case. This doesn't require the Court to address the framework question of whether a broader framework or the Lopez framework applies, because under Raich, the production of any commodity, every instance of the production of any commodity, is commercial activity that can be regulated by Congress. This is the same as the marijuana at issue in Raich, the wheat at issue in Wickard, and as this Court recognized, child pornography in Sullivan, other courts, the Sixth Circuit in Bowers, the Ninth Circuit overruling prior precedent in light of Raich. But under that, don't you have to have some substantial effect on commerce? In the aggregate, Your Honor, yes. So because the conduct, the production of a commodity is economic, you can aggregate all of the instances of production of the commodity. And if you look at the production of child pornography, in the whole, that has a substantial effect on commerce, because there's a thriving global trade in the illicit commodity. Just as there is in drug trade, and just as Mr. Filburn's 12 acres of wheat had, although small in itself, if you aggregate all the production of wheat, that has an effect on the market. It just seems hard to imagine that our Congress has that scope of authority to regulate with respect to conduct in other nations, even assuming that that conduct in the aggregate has an impact on the global market for child pornography. I mean, I understand we're in an as-applied challenge here, but we have to think about what the implications would be if you were here next week with a case seeking to prosecute a Vietnamese national for the same conduct. Same argument? Yes and no. And I think this is a good opportunity to explain that the Article I question doesn't do all of the work. So this case is only presenting the Article I question. But in terms of what Congress can reach, it's not just Article I power. There's also the presumptions against violating international law or applying the law extraterritorially. You also have the due process question, which this Court hasn't yet fully held, but other courts have applied. And if you're talking about a Vietnamese national, you would have a due process question. I don't know exactly how that would shake out. It would depend on the facts of the case. But here we're talking about a U.S. citizen, which satisfies that due process concern. There's a Vietnamese citizen with no contact with the United States. Our courts wouldn't have authority under the due process clause to reach them. And I take it your argument is because it's an American citizen, we do have the authority under the due process clause to reach the person. Yes, Your Honor, that's correct. Well, that seems pretty simple. You said it would require a lot more analysis. No, I'm saying in Judge Pollard's hypothetical, if you're talking about a different case, I think in any case, we have to look at each of those components. And so this statute satisfies those presumptions, right? Is due process satisfied in this case where the individual has not been? I mean, is it satisfied just categorically for every national? Yes. And every green card holder? Due process is certainly satisfied categorically for citizens, and I think that's pretty clear from the Supreme Court's holding in Blackmere. Other courts have also considered the due process question and held that citizenship by itself is enough. Blackmere is a case where the citizen moved abroad. He was residing in France. He had been there for a number of years before the subpoena had been issued, and then he's held in criminal contempt for refusing to answer the subpoena. So the Supreme Court there says that citizenship comes with it, the benefits and burdens that you maintain your citizenship, you have to answer to U.S. laws. And so that satisfies the due process component. You know, also, this statute, because of the citizenship, complies with international law. Because of the way the statute is written, it complies with the presumption against extraterritoriality. And so you have, you know, it's not just the Article I power that's doing work. I know this is not this case, but it's been very helpful to hear you sort of sketch out the structure under which we think about it. If this were this case with someone like Mr. Park, who's a U.S. national, happening in Vietnam, and the victim were from Laos. And I don't know if they are a signatory, but assume that Laos is also a signatory. And Laos wants to prosecute, and the U.S. wants to prosecute. And Vietnam, being the place where it occurs, wants to prosecute. How does that get worked out? So then you would have a, that would be a question under an extradition treaty, and I'm not sure exactly what our treaty arrangements are with those countries. But generally the place where the conduct occurs has first dibs, so Vietnam would get to go first if they want. And that's, if you look at the Pendleton case out of the Third Circuit, you know, he was prosecuted in Germany where the conduct occurred before he returned to the United States and was prosecuted here. So it does happen sometimes where there's a prosecution abroad where the conduct occurred. You know, then as between the place where the victim is a national of and where the I just don't know the answer to that question, but it would be a question of treaty law. And if the treaty, if the extradition treaty sort of double jeopardy analog didn't prohibit it, you could actually theoretically have prosecution in Laos and prosecution and sentence in Vietnam, prosecution and sentence in the United States. You could. It would depend on the treaty. So different extradition treaties treat that differently. What's the nexus with the United States? The Constitution talks about regulating commerce with foreign nations. So there's got to be a nexus to the United States. What's the nexus to the United States on the pornography here? So if we're still talking about the production count, right, the F3 conduct, then the nexus is that there's a market and that every instance of production of a commodity What's the nexus with the United States? That the market, the United States, that market exists in the United States as well. Now, if you're talking about production of a commodity abroad, you have these other questions about whether Congress can regulate those things. And, you know, then you're talking about is there jurisdiction? Is there venue proper? Is, you know, can you really send out the FBI to go get people? So your argument is that the production of child pornography in this instance in U.S. markets? Yes, just as the production of, so you're looking at that production of marijuana. In California, whether it had impact on U.S. markets, that's a little more tenable than to say a single instance of production of child pornography in Vietnam has some impact on U.S. markets. I think the reasoning is no different, Your Honor, because under California law, that marijuana had to stay within the production of the The reasoning is very different. One's under the Interstate Commerce Clause, right? And the other's the Foreign Commerce Clause. They're not the same. They're not, Your Honor. And the Foreign Commerce Clause is actually broader, which brings us to that second Is it? Is it? Yes, it is, Your Honor. Every court to have addressed What work does the word with do with foreign nations? Does it do any work? It does. And if you look at Bollinger, the Fourth Circuit talks about with. And it's talking about a U.S. citizen acting inside another country. Is the United States engaging with that country? Because citizens represent their countries abroad. And that's at page 214 of the Bollinger opinion. So I think that is a good analysis of the with. The Durham opinion also talks about that textual analysis of how with and among are different. And we get to that in all the courts who have looked at this, that in the foreign context, there is no federalism concern. There's no need to defer to the states who are going to take up that mantle. And that's, in fact, when we shifted from the Articles of Confederation to the Constitution, one of the things the framers were doing was trying to move more of that foreign power to consolidate it in the national government. And this, you know, talking now about the F1 conduct, there is a relationship to the market. There is a nexus to the market. Looking at the travel, the sex tourism is obviously part of the market. And that line between when travel morphs into residing, it's a fuzzy line. So it's not irrational. And remember, the standard is rational basis. It's not irrational for Congress to want to plug those holes, to close those loopholes, to close the gaps and say to make the regulation effective, we're going to make sure that you can't outrun the law, that you can't lie low for a few months and it's not travel anymore. Now you can do whatever you want. I mean, ordinarily that's dealt with by information supplied by countries through cooperative agreements about where people who are suspected of crimes are located. This is a more aggressive approach. It's very odd to think about the – I mean, in some ways it makes sense that the Foreign Commerce Clause would be broader for reasons that you say because you don't have the federalism concern. But federalism in a sense is a system of independent sovereigns and it's modeled to some degree on the international community of nations. And the notion that the United States would have more authority, even in the absence of the supremacy relationship that the federal government has with the states, over actions happening in the territory of other sovereign nations, it doesn't seem to me actually as easy as your argument would suggest. I understand your concern, and that's why I think we've got to back up to the – this is just the Article 1 question, and you have those other areas of things doing work. And so that's international laws doing that work on the sovereign-to-sovereign state, international framework. And there are the five bases of international law. And so in the way that the federalism is policing that relationship between the states and the federal government, international law is serving that function between different countries. And here we're complying with international law. So I don't think that it's really that out there. And when you consider that the Article 1 power doesn't have to do all of the work, that there are other factors that also do work. I think I want to touch briefly on the treaty before – I was just wondering why you don't rely on decisions of the Supreme Court of the United States rather than courts of appeals. You have the Japan case, the Supreme Court saying the scope of the Foreign Commerce Clause is broader than the scope of the Interstate Commerce Clause. So – and that that was what the founders intended. That's a quote from that case. It seems to do more work than just making an argument about what a bunch of circuits have said. Yes, and we cite Japan line. And it's – there are only two Supreme Court cases that have touched on the Foreign Commerce Clause. And the reason we talk about the circuits is that those courts have considered this particular statute. So I think in some ways that's helpful. But, yes, in Japan line, the Supreme Court says that the founders intended the Foreign Commerce Clause to be broader because there is no federalism concern in that area. We think that's right. We think that applies here as well. I'm troubled by the scope of your argument. So it seems to me you're saying that any economic activity engaged in by a U.S. citizen abroad falls within the ability of Congress to regulate it under the Foreign Commerce Clause. Is that what you're saying? A U.S. citizen in France buying a sandwich?  That somebody engaged in economic activity affecting the sandwich market? That can't be the right answer. It just can't be. Instinctually, we just say Congress' reach can't go that far. But I don't know what the limit is on your argument. So certainly Congress could, and in some senses Congress has, put regulations on prohibiting, for example, the use of the U.S. financial system on any transaction, for example, involving sanctioned countries. And by that logic, Congress could say you may not use the financial system to engage in transactions of buying sandwiches in foreign countries, which is essentially the same prohibition. I'm curious. My point is just this idea that because the rule seems very broad, it must be wrong. It would apply the same to having a jurisdictional hook. It would apply the same to requiring the use of the financial system. It would apply the same to many other things. So the U.S. tourist in France who buys a sandwich there, conceivably that activity could be regulated by Congress? Yes. I mean, in Black Mirror, the court said that the U.S. citizen refusing to return to the United States, unless taking inaction, is within Congress' power to regulate. So the sanctions upheld against Iran, against Sudan, the sanctions against Cuba in the Helms-Britton Act, which essentially regulates the entire global system, preventing countries from all over the world from trading with Cuba. That is a huge regulation, and yet no one questions that that's part of the Congress power. You could make the same argument about Mr. Filburn or whatever his name was. Filburn, yeah. Could Congress have regulated the eating of sandwiches? And the answer, I think, to that would have been no, unless Congress had a complete program of controlling sandwich eating around the entire U.S. in interstate commerce, as to which eating this particular sandwich might be relevant. The reason it worked in Wickard was because they did have a program with respect to wheat quarters. The reason that it worked in Resch is because there is a comprehensive program with respect to drug distribution. It's very hard to imagine what the program would be in the example of the sandwich eating, and therefore unlikely that would be constitutional. So that horrible hypothetical is one I think you can probably give up on. Yes, Your Honor. I was assuming that there would be a universalized prohibition, and I think it's highly unlikely Congress would enact that law, but were Congress to prohibit sandwiches in the same way that it prohibits marijuana, sure, it would be just like Resch. But it would have to be that kind of comprehensive regulation, and here we have a comprehensive regulation targeting both child sexual abuse and the production of child pornography. You want to talk about the treaty power? It's the other half of your argument, and we're over time. The treaty provides an independent basis for reversing the district court. This treaty, the optional protocol, is a treaty ratified on advice and consent of the Senate, and it targets the production of child pornography very clearly. That doesn't have any commercial definition to it. That definition tracks very neatly onto the definition in F3. The resides prong of 2423C also tracks very neatly onto the part in Article 4 of the treaty that talks about targeting your own nationals abroad. And so those pieces, I think, flow directly from the treaty and are neatly within. That includes the conduct with the child unrelated to the pornography? I think that's the third aspect, and that's a more difficult question because it's not quite as direct. There you have the one-stepper move from sex tourism. The treaty is talking about the sale of children and child prostitution, which in the preamble it says sex tourism is an integral part of feeding both of those things. And then we're back to this question about whether taking the resides away from the travel to kind of solve that fuzzy line problem, or in the cases where remuneration or any other consideration, the treaty says, can be difficult to prove, we're going to kind of make a prophylactic rule that plugs in the gaps, that fills the loopholes. Isn't there language in the preamble to the protocol that suggests it's much broader than just sexual exploitation? There's language of irresponsible adult sexual behavior as a prophylactic to this. Is it your argument they're stronger than you're suggesting? It could be. The preamble gives you an idea of what is rationally related to implementing the articles of the treaty. And there it's talking about, yes, it's talking about sex tourism, it's talking about the exploitation of children in all its forms, and the need to take a holistic approach. So we're taking that holistic approach that is the idea of saying we're not going to turn our prohibition on the need to prove beyond a reasonable doubt a quid pro quo exchange of money, to know that the exploitation of every child fuels the market for sex tourism, for child prostitution, for the sale of children and child trafficking. If we disagreed with your argument on the foreign commerce clause, does Congress have the power to enact this statute to go beyond its enumerated powers in the treaty? Yes, Your Honor. Missouri v. Holland says yes, and that's still the law. There are in bond, there were three justices who expressed some concern with that view. Were there three or only two? I thought Justice Alito only joined part one of the dissent. Yeah, well, I don't remember exactly, but whether it's three or two, it's not five. Good point. And this court obviously is bound to follow the laws that exist, which is Holland. And also, if you take that view that it's – I'm going to stop there before I get myself into trouble. I was going to ask you, along those lines, it seems possible that your strongest argument combines your two arguments, that you have a comprehensive scheme under the treaty, and that whatever one thinks about the separate opinions in bond and the reasoning, and whether, in fact, Missouri v. Holland doesn't articulate all the relevant limitations, at least in this case, you have a treaty, you have – to my sovereignty concerns about other nations, you have countries coming together. And then when the treaty comes back to the United States and Congress is asked to implement it, at least in that kind of context, Congress has the full scope of the foreign commerce power, as you describe it. Yeah, I think that's absolutely a reasonable way to look at it, you know, to put together the power to regulate commerce in a comprehensive way, that this treaty asks for a holistic approach to eradicating these problems, and that Congress generally has, under Curtis Wright, this broad foreign affairs power to speak with one voice for the nation. You also have in the legislative history of the PROTECT Act other countries coming to the United States, asking for their help in solving this problem. So this situation in particular – Is it other countries or is it only the United Nations that came and said, look, you still haven't fully addressed this? Where's Vietnam in this? Do you have anything in the record on that? Not Vietnam in particular, but we have the United Nations through these reports, the 2010, 2012, 2016 reports, and the dialogue that's going on there. And then we have in the 2002 House report for the PROTECT Act, for the predecessor to the PROTECT Act, where the report talks about other countries have asked the United States to help crack down on sex tourism, that Americans are a large part of the problem going abroad, driving this market. And it doesn't specify which other countries, though we know that Southeast Asia is a target region for this type of behavior. So, interestingly enough, I was thinking the same question that Judge Pillard is asking. There's a Supreme Court case, United States v. Lara, which is about the Indian Commerce Clause, and it rests on both the treaty power with the Indians and the Indian Commerce Clause for the authority of the United States federal government to enact statutes that apply wholly within the Indian country. What would you say about that kind of analysis? Again, I think that any time, it's our position that either stands alone. But certainly any time you put the powers together. We'd like to win on any ground you can. I understand that. But, you know, we also like to win by a lot. Mr. Greenwood would like to win on any ground he could win, so that doesn't salvify. But any time you're putting the powers together, I do think that they bolster each other, that you are getting that, you know, if the question is, is this something, at bottom, right, if the question is, is this something that the founders intended the national government to be able to address,  you have a stronger answer to that question, which is that this is the national government speaking with one voice to effectuate a treaty that it's negotiated under international law with other nations to respect everyone's sovereignty and targeting a problem that is fundamentally economic. I had an unrelated question about the count. There's just one count? There is. So what would be the implications if we only reached one of your boxes, one of the two statutory grounds? We'd ask the court to reach at least one rationale for each F1 and F3 conduct so that we know what to proceed on at trial. But functionally, why is it, I guess I'm asking, why is it just one count? I'm more familiar with seeing two separate counts on something like that. There's underdeveloped law on what the unit of prosecution is. Under the resides, we've only had a couple of these cases under resides, and under the travel prong, we've long conceived of the unit of prosecution being the act of travel, though in some cases, like the Durham case, it was prosecuted as the unit of prosecution is the victim. So there's just some disagreement. Obviously, prosecuting it as one count is actually favorable to the defendant because it reduces the statutory maximum. He hasn't raised the duplicity challenge in the district court. It's one count with two methods as to which the jury would be asked to say which of the two or both in a jury instruction? Or verdict form. In a verdict form? Yes, it's certainly possible. Can I ask, did you concede that there's no commercial aspect here? The defense seems to say that. Then I read something in your reply brief saying that this was potentially commercial because it was a trade of teaching to entice the kid to come to the apartment. What's the government's position on that? You have that in the complaint, right? That is in the complaint. Yes. You got the kid to come. Yes. Yes, yes. So now we're talking about, this is just. I know, it's on a different subject. No, no, I just want to be clear. The F1 conduct only involves the teaching, and the defendant used his commercial position as a teacher to lure the child to his apartment is our position. So that's the facts of this case. The statute doesn't require, it's an element of the statute, so it doesn't require that proof at trial beyond a reasonable doubt, but it is present on the facts of this case. And you say, here the government alleges that Park's presence in Vietnam on a business visa involved commercial activity, teaching that he used as a pretext to lure minor children to his home. So you're not arguing this with respect to the constitutional as applied theory as purely a non-commercial case? That's right. Even as to that problem? That's right. There's a difference. We continue to think that the conduct in, for example, the Reid case of the incest is related, because I think as the facts of that case show, the defendant both molested his own daughter and engaged in commercial child prostitution, where he patronized a child prostitute, conduct to which he's pleaded guilty in another court. So these things are related. But if the court were to draw a line between incest and Mr. Park's conduct, there's still a difference there, because this conduct did involve that commercial lure. But you did not charge in the alternative under, because there's not a. . . We don't have evidence of a quid pro quo, which is what. . . And they're not. . . So the government chose not to put itself in a position where it would have to prove that. But what would the count be, if it were? Because the commerce is typically the travel, right? In the F-1 type situation, it would be. . . Or it wouldn't be F-1. In the situation where you were substituting the non-commercial, reviving and doing the conduct. I'm just trying to think of. . . I mean, there's the constitutional question, which. . . Commercial, non-commercial. But then there's the statutory question.  Commercial, non-commercial. So the statute C. . . 2423C permits charging under one of six theories. Either. . . And this is another matrix. Either travel or resides across F-1, F-2, F-3. Any time you have the travel with any of that conduct, that's travel in foreign commerce. When you're talking about the resides, the F-2 conduct is a commercial sex act, which is a quid pro quo trade of something of value for the sex act. F-3 is the production of child pornography, the production of a commodity, which is part of a market. F-1 is. . . So that resides F-1, which is one of the two things we have here, is admittedly the least commercial of the six things. Right. And you didn't charge in the alternative F-2. That's correct, Your Honor. We didn't because we can't prove beyond a reasonable doubt that there was a quid pro quo exchange in this case. And that's part of the idea that you look at that B to C in the Protect Act, where Congress says there are problems of proof, of proving the intent. So we're going to take out the intent requirement to make it easier to eradicate this conduct. But then you're looking at that commercial to non-commercial, the problems of proof on proving the quid pro quo, especially where the child is really the one getting the money, that's very difficult to prove. So even when it is commercial, the child often doesn't know. Where does the idea that he lured them, that's an explosive word, where did that come from, that he lured them to his apartment? Well, two things. I think that's our word, and I think that's something that if that became an element of the offense, I would welcome the opportunity to prove it because the jury could infer from his long history of child predation and the fact that he's advertising to teach English to children at his apartment that he did it for this purpose. That he's advertising the teaching in order to get children into his apartment, away from their parents in a vulnerable situation, as child predators often do. Well, and business people. I mean, he advertises to teach all the obvious markets. Yeah, we don't have any evidence that he's teaching adults and not children. No, but I thought the record had some specifics on who he was advertising to teach to and included business people. Yeah, I mean, so he's passing out his card. But the idea that he's using that as a way to get children into his apartment, into a private place, away from their parents where they're vulnerable, especially if you look at his history, it's not a leap to say that he's doing this on purpose. Well, you have the complaint in the case listing the elements of probable cause and listing what was told to the agent by the victim's mother. Section 16A says he provided victim with his address and invited victim to his apartment for additional English language instruction. And then approximately two weeks after their first encounter, they have the sexual misconduct. If you would just put it to the jury, circumstantial evidence, to decide whether the two were connected. Yes. Yes, Your Honor. And, again, it's not an element of the offense. It's more an atmospheric idea of, you know, if his conduct is within Congress's scope of commercial power. Further questions? Thank you. Good morning, Your Honors. May it please the Court. A.J. Kramer on behalf of Mr. Park. Let me answer one question first. The government in a bill in particular said that none of the alleged conduct involves a commercial transaction. That's at page 25 of the. . . That's what I was wondering about the two seemingly inconsistent positions. So, well, they at least told the district court, and the case proceeded in the district court on that. Was that about the content of the charge, or was it necessarily about the constitutional as applied question? No, that was a question about what is exactly being charged here, because it just contained the statutory language. I guess that's consistent with what she's saying, that the charge isn't a two charge. It's a one or a three charge. But as to the question of constitutional as applied may be a different question. Well, the district court proceeded on the. . . I know that the district court did, but I just don't know whether that's correct or not. Well, I think it's correct based on what they told the district court they're charging in this case. It's correct as a charge. The question is whether you consider the statute as applied in particular circumstances. You look only at the charge. I don't know what the answer to that is. Well, I think you have to go with the circumstances that they say they're going to prove at trial when you deal with a motion to dismiss like this, accepting those facts. But it's the information they're going to prove at trial with respect to the charge, but the background of how the person got to the apartment can be proved, even if it's not the charge. But the background. . . Sure, they can put in how the person got there, but that's. . . If they presented some kind of. . . tried to prove that, that would be a variance from what they said in the bill of particulars with whatever. But in any event, I don't think it's. . . But I want to start off, I guess, with. . . I think the district court, by the way, got it exactly right in its opinion. The notion that the foreign commerce clause is broader than the interstate commerce clause. In the Supreme Court's opinion in Gibbons v. Ogden, they talked about the foreign commerce clause and said, no sort of trade can be carried on between this country and any other to which this power does not extend. And they talked about the foreign commerce clause. And they then said if this meaning of the word about commerce is in its application to foreign nations, it must carry the same meaning throughout the sentence as to interstate commerce and commerce with Indian tribes as well. In Gibbons v. Ogden, they said the word commerce has the same meaning with and among. And they said. . . They went on to say that there's really no difference between the word with and among, like the government tries to make out, because they said commerce among the states must of necessity be commerce with the states. So I know there's a. . . Mr. Kramer, a lot of water has passed under the bridge since the great Chief Justice wrote that opinion. We have Raich to deal with, and we have Whitford v. Filburn to deal with, which take, some would argue, a very different approach to the commerce clause language. I think they take a very different approach to the scope of the interstate commerce clause. What they don't say is that the foreign commerce clause is broader. That comes from one line in that Japan case. Yes, that is right. That's one line in that Japan case, which happens to be a decision of the Supreme Court of the United States. It has never been subsequently cited by the Supreme Court, I don't think, for that proposition. Well, has Gibbons v. Ogden ever been cited for the proposition that the foreign commerce clause is the same as the interstate commerce clause? I think it was for a period of time when. . . Can you name another case? No, not off the top of my head. And we also have the Supreme Court of the whole United States saying that the Indian commerce clause is broader than the interstate commerce clause, and is plenary. Yes. So obviously the Court thinks since Ogden. . . And it's not clear to me what they. . . To be honest, the part of Ogden that you cited is from the syllabus, actually, not from Justice Marshall's opinion, which may or may not be correct. But it's a little complicated, and it relies on the word among. But we have much stronger statements by the Court in Cotton with respect to the Indian commerce clause, and with respect in Japan with respect to the foreign commerce clause. And, by the way, we have the problem that Indian and foreign both use with, and interstate uses among, which would be a reason why you would treat them different, and another reason being federalism. So there seems like there's a reasonable argument here. Well, if there is, the Supreme Court has never acknowledged it as to what it's composed of or what it means, let me put it that way. Is that what I would call a throwaway line in the Japan lines case. Or a throwaway line in Ogden, which was not about the foreign commerce clause. It was not. They have, however, in the rates case, if that's the way you say it, I'm not sure, the marijuana case, they did say that they used the language, the foreign and interstate commerce clause essentially interchangeably in the rates case. They said that this was analyzed under the language of the foreign and interstate commerce clauses. They talked about the issue in the case was that Article I, Section 8, requiring its authority to regulate commerce with foreign nations and among the several states. They seemingly used that to mean the same thing. They didn't refer to the Indian tribe commerce in that. So then you would give up your argument that, in fact, foreign is narrower than interstate. No, I think it may well be now. It's certainly not broader. You just told me that. That they see it. They said it was the same. Well, what I think I said was that it's not broader. You said that, but your citation, which I don't recall from race, didn't say that. No, no, no. I'm not saying that the foreign commerce clause is necessarily narrower. What I'm saying is it's not broader, as the government argued, and as you seem to indicate from the Japan lines case. But I think that's not correct, or at least the Supreme Court has never reaffirmed that. Let me put it that way. But in any event, I think that no court has addressed the residing prong and held this, that that can be enough of a connexus to the United States or to the foreign commerce clause to uphold this statute. It is the only ones that have upheld it have done with the travel in foreign commerce, in connection with the travel. The government talks about a murky line between travel and residence, but that's just a red herring because in this particular case, he's charged with residing there. There's no question he permanently resided there and lived there. And the foreign commerce clause does not give the United States plenary police power, which is essentially the government's argument over this. Judge Griffith, your analysis about the sandwich in the Al-Maliki case, the Sixth Circuit noted that the government had no response to the fact that under the government's theory, they could outlaw jaywalking in foreign countries because that could have an economic effect on the United States. If people, if United States citizens are hit while jaywalking, that causes insurance costs and medical costs. And it would be pretty simple. The government said that they had no argument to the fact in Al-Maliki to the jaywalking hypothetical. So there is no answer to the fact that this is an unlimited extension of so-called jurisdiction of the United States over any police, over police power all over the world, as the Al-Maliki case pointed out. So it just doesn't, under the foreign commerce clause. It doesn't matter whether it's an American citizen or not? I don't think under the government's argument it does. It could be a, there's no reason it has to be an American citizen. Under their argument of that it has. Well, the statute requires it to be. The statute, oh, I'm sorry. I thought you meant theoretically. Well, as to this sandwich and all these other hypotheticals. The statute requires an American citizen, but there's no reason it has to be that either. Under the government's argument. Do you think that if an American citizen is killed abroad by a foreign terrorist organization, is that, we couldn't make that illegal? And if we caught the person bringing them back here? It depends. That may be under a different constitutional authority. I don't think under the foreign commerce clause, no. So which one? Possibly, well, it may be a crime against humanity. There's things like piracy. I don't remember a crime against humanity provision of the constitution. No, but there are crimes against mankind. Really? In the constitution? No, well. Not our constitution. There are things in the cases discussed, which against the law of all nations, I guess, is the wording. But I don't think it would be permissible under the foreign commerce clause. Let me put it that way, which is all that's at issue here. Hostage taking? Possibly it could have an F. I mean, I guess you could run that out. Non-commercial hostage taking. Non-commercial. No demand is made for ransom. Of an American citizen who resided in a foreign country, I would say no. Of an American citizen who was on tourism or travel, then. American citizens who are residing in Israel for a year and are killed either in a terrorist attack or a hostage taking, of which we have a lot of those cases here, those are all unconstitutional statutes? I think they're, well, I'm only addressing the foreign commerce clause. Well, and I'm offering you an alternative. Tell me what the alternative is. Well, I don't know what the alternative would be. I'm saying I don't know what they've been upheld under or not under the foreign commerce clause. But in any event, that's far different than what we have here. So it's sandwiches. If we're going to have horribles, then we should have the horribles. I don't see the difference with sandwiches in the sense that someone could be poisoned by, there might be a judgment that French sandwiches are inferior. I mean, you can, the problem is the government's, there is no end to the government's argument. As they said in Al-Maliki, the government could outlaw jaywalking in a foreign country under this theory. So the district court got it right. Judge Hartz's dissent in the Durham case, the most recent case to come out, I think is also right on point. That case upholds it under the channels of commerce, something the government hasn't argued in this particular case. But that was the travel, in any event, the travel, not the residing. As for the treaty power, I would say several things. First of all, this statute, there's no indication or expression that it was passed to implement the treaty. Every other case, the Bond case being a prime example, that statute was actually called the implementation of the chemical weapons treaty. You would agree that the Supreme Court has said expressly and recently that Congress doesn't have to say the basis for its, the constitutional basis for its legislation. And all we have to do is find one that's rationally related, right? That's what the Court said in NFIB. That's what the Court said in the Beach case, right? Those aren't old cases that haven't been repeated. They've been repeated several times. It's not at all clear to me that that applies to the treaty. They've never said that about the treaty power. They said the constitutional basis. Why would that be different? Why would the treaty power be different than the tax power or the interstate commerce laws power? Because if you're implementing it, to implement a treaty, you have to pass something with that treaty in mind. Otherwise, it's not implementing the treaty. This statute was passed long after this treaty and no indication that Congress had this treaty in mind. As Judge, no court has actually upheld this as under the treaty power. Mr. Kramer, what do you think is evidence that Congress had something in mind? I mean, the easy case is when the name of the implementing statute tracks the treaty, but you're not requiring that, are you? Well, every case where there has been a discussion of a statute implementing a treaty, usually the statute is actually called a statute to implement the treaty. If there was an exception, and there's no cases cited by the government, it might be within a few weeks of the treaty or a couple of months. So you're saying that if Congress is acting under the treaty power, it has to expressly invoke the treaty? Well, it doesn't have to. What does it have to do? I'm trying to figure out what it has to do. I think this answer is yes, or it could pass it later and say this is to implement the treaty. I guess that's an express invocation of that, or fairly close on the heels. But I would take Judge Hartz's quote from Durham and say, Congress never mentioned in the text or the legislative histories of this statute, even if one were to do so, the government's reliance would be misplaced. The optional protocol covers only commercial sex offenses against children. It says nothing about the effects of noncommercial sex offenses on foreign commerce. The optional protocol calls on states to create and enforce laws that prohibit the exploitation of children for commercial gain. So I don't see how this statute implements the treaty in any way in any event. I mean, that's the only court that has, Judge Hartz is the only judge that has addressed this. The government has either in most cases not claimed reliance on the treaty, or as in Durham, they claimed reliance on the treaty, but the majority decided it on a different ground, so it didn't address the treaty. But truly, if there was reliance on the treaty, the treaty contains an incredibly broad statement of various things about it requires, they say, believing that the elimination of the sale of children and a holistic approach should be adopted, addressing the contributing factors, including undevelopment. I think, Your Honor, Judge Griffiths said irresponsible adult sexual behavior, poverty, economic disparities. Truly, in implementing this treaty, Congress could alter the complete nature of the United States, I think, by talking about dysfunctioning families, lack of education, urban to rural migration. I mean, it's an unlimited basket, it seems to me, of legislation that could be adopted under the government's theory under this treaty, but the treaty was only about commercial sex offenses against children and prohibit the exploitation of children for commercial gain, and that's not what this statute does with respect to the resides clause as applied to this particular case. This is a non-commercial transaction. And what about the cases that say, with respect to the treaty power, like Missouri v. Holland and others, that the issue is really the necessary and proper clause, and it just has to be rationally related to the goals of the treaty. It doesn't have to be expressly what's in the treaty. And then that brings us back to the argument the government makes, that this kind of activity certainly is rationally related, unless you think it's not rationally related. Well, it's not, according to Judge Hartz, it's not rationally related. I appreciate that, but as you know, Judge Hartz is not, not only is he not precedent here, he's not precedent even in his own circuit. Well, he was the only judge to address the treaty theory in that case. I think he's the only circuit judge to have addressed it in the country. But I would say this, and by the way, in the Bond case, Judge Alito joined also in Justice Thomas' concurrence about the treaty. So now we have three. So there's three, yes. But on different grounds. Justice Thomas had a different theory on the treaty right than Justice Scalia, but it was still here. And he agreed with Justice Thomas on his argument about the treaty, why it was not correct. So the treaty argument, I think, first of all, as I said, it's not, it doesn't address, it's just as Judge Hartz said, it doesn't address what this optional protocol says in any event. Congress gave no indication. And then you've now essentially, there's again, given what this optional protocol says, there would be no limit, again, to Congress's power. Maybe you said it, Mr. Kramer, but I didn't hear it. Why would there be a different requirement for the treaty power than there is for exercise of other powers? You're saying when it comes to the treaty power, Congress has to make it clear that they're implementing it, either saying expressly, or that's what you said, expressly. But as Chief Judge Carlos pointed out, that's not required in exercises of other sources of authority. Why would it be different? You said that the cases show that Congress has given that sort of explanation. Why is that necessary, do you think? Well, I think you can't just have a statute out there and then try to go pick a treaty somewhere to try to justify it. I think that would turn the legislative process upside down, frankly, and the constitutional process upside down. But you can take a statute and just go out and make up an argument about how marijuana control in one state will affect the interstate government. In fact, you can take a statute in which Congress has expressly said we are not using our tax power, and yet say that it's upheld under the tax power. And just to be clear, what the Supreme Court said in that case, NFIB, is the question of the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise. And that may well be why the dissent, well, the concurrence in Bond are correct about the treaty power, because the constitution gives the president the power to make treaties with the concurrence of the Senate. And that may well be why... However persuasive even three justices are, they are, as the Supreme Court has always told us, only three justices, and we have to go with the existing case law. But a treaty is not the constitution. Right. If we took your theory, then there would be nothing that could be done. That is, under one of these dissents, the treaty power actually does nothing. The only power that Congress has is to send diplomats to negotiate the treaty. That would be quite a change in Supreme Court law. Isn't that right? I'm not sure it would be a change in the sense that the Supreme Court has never really addressed the issue. I thought where you were going, Mr. Cramer, was that sort of the extent that Missouri v. Holland is the law, which it is, and the bond dissenters are not, or separate concurrences are not the law, that the treaty power is different from other congressional powers in that it seems to authorize Congress to do things that would otherwise be beyond its Article I powers. And that given that special kind of expansive move under the treaty power, that there's a reason that is absent in Congress's other exercises of its enumerated powers, to require that we be told when Congress thinks that's the font of power that it's relying on. I think that's exactly right. I think that you can't – it would allow the President and Congress to make treaties about essentially anything and then enact laws to implement them that may be totally contrary to other constitutionally enumerated powers. I mean, I can just think of a – Well, there you're going further. You're going to the concurring opinions. And I'm saying, assuming under Missouri v. Holland, that Congress can be given powers by executive and senatorial treaty action that it doesn't have under Article I. When it does that, doesn't that itself create a reason that Congress would have to advert to the treaty in order to take advantage of that power in a way that doesn't have to advert to the commerce or the taxing or the, you know, whatever other powers? So you don't even have to go there and ask us to follow the bond concurring opinions to prevail on that ground if, in fact, we were to agree with you that there's a special and different rule of power naming for Congress when it's acting under the treaty. No, I think that's right. I mean, I think when you're talking about – because there's innumerable treaties covering innumerable topics, obviously. And when you're talking about Congress implementing them, it seems to me – whereas Congress is passing statutes that may be constitutional under an enumerated power, when you're talking about implementing a treaty, you have to have Congress say what treaty they're implementing and in what way they're implementing it. Because otherwise, you can just find some paragraph in some treaty like this that says, including underdevelopment, poverty, economic disparities, inequitable socioeconomic structure, dysfunctioning families, lack of education. I mean, Congress could take all kinds of actions and somebody could read this treaty and say, that implements this treaty. I don't understand the assumption that this isn't an enumerated power. The Necessary and Proper Clause is an enumerated power. And it gives Congress the authority, as was used in Comstock, to enact all laws necessary and proper to the powers of the United States, not just to the powers of the Congress. So it's not right to say that this is not an enumerated power and, therefore, that it's somehow different. Well, I think it's an enumerated power. The power being used here is the Necessary and Proper Clause. But Comstock was not a treaty. Comstock was not implementing a treaty. No, I know. But it's a nice argument that we should treat the treaty power different than all the other powers. But since, in the end, they all rely on the Necessary and Proper Clause, I'm not sure how nice it is. I think there is a qualitative difference when you're using the Necessary and Proper Clause to implement a treaty as opposed to justify under an enumerated constitutional power. There's a substantive difference there in what Congress has to do in that regard. And you can't just hope that some treaty at some point justified, that there's some mention in some treaty of something that would justify, that would make it necessary and proper. I just don't think that the Necessary and Proper Clause goes that far in the treaty. In any event, there is support for what the district court did in this case and other cases. And the district court's carefully considered opinion, again, dealing solely with the residing clause, should be affirmed. Thank you. Thank you, Mr. Kramer. Is there time left? We'll give you another two minutes as it's a practice. Why it's a practice, I don't know. Mr. Kramer usually gets the advantage of that practice. Just real quickly, I want to address Your Honor's point about the statutes where we're talking about killing U.S. nationals abroad. There are, as you know, a number of those. The one that perhaps goes the farthest is 1119, which is murder by one U.S. national against another U.S. national abroad. Two district courts have considered that statute on their constitutionality concerns and held them both valid exercises of the Congress' power. And if you look at the 1116, which is the more like terrorist protected persons statute, the challenges under that statute don't come under the Article I issue. They come, and this goes back to that we were talking about before, about those other powers that are doing work. And they come under the due process challenge. They come under the extraterritoriality problem. And so we see that the Article I power doesn't have to do all of the work. Your Honor is exactly right about the necessary and proper power being the enumerated power that's at use when we look at the treaty. And again, I want to say that even on the treaty, Congress can't just go out and make, or the president couldn't go sign the suppressing religious freedoms treaty and then have Congress implement that with a statute that outlaws the First Amendment. Because other parts of the Constitution can still trump the exercise of those Article I powers. So there are still other limits existing. You can't go out and make a treaty that eliminates the Fourth Amendment and now we can just search everybody all the time. That's not how it works. And Judge Pillard, to your question, I think even if we are talking about a factual, that at the time Congress enacted this statute, we need some factual proof that Congress was relying on implementing the treaty. Here you could see that from the record. You could infer that from the U.N. reports where the U.N. is criticizing the United States for not having a residing jurisdiction. So I think it's rational to think that the State Department, in responding to those reports, was telling Congress they existed. So you could find that in the record. Thank you. We'll just ask a couple questions. Thank you. We'll take a matter or two. Thank you. Stand, please.
judges: Garland, Griffith, Pillard